# Exhibit G

**CERTIFIED COPY**

1  UNITED STATES DISTRICT COURT

2  CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4  MOSAIC BRANDS, INC.,            )  No. 2:20-cv-04556-AB-JC
                                   )
5              PLAINTIFF,          )
                                   )
6          VS.                     )
                                   )
7  THE RIDGE WALLET LLC,           )
                                   )
8              DEFENDANT.          )
   _____ )
9                                  )
   AND RELATED COUNTERCLAIM.       )
10 _____ )

11

12                    VOLUME I

13     THIS TRANSCRIPT CONTAINS PORTIONS MARKED

14        CONFIDENTIAL, ATTORNEYS' EYES ONLY,

15       PURSUANT TO STIPULATION BY ATTORNEYS

16            WHICH ARE BOUND SEPARATELY

17     VIDEOTAPED DEPOSITION OF MIA KAMINSKI

18                 February 5, 2021

19

20

21

22

23

24  ANGELA POURTABIB, CSR No. 13714.
    470479
25

BARKLEY
Court Reporters
barkley.com
SINCE 1972

(310) 207-8000 Los Angeles     (415) 433-5777 San Francisco    (949) 955-0400 Irvine         (858) 455-5444 San Diego
(310) 207-8000 Century City    (408) 885-0550 San Jose         (760) 322-2240 Palm Springs   (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento      (800) 222-1231 Martinez         (702) 366-0500 Las Vegas      (800) 222-1231 Monterey
(951) 686-0606 Riverside       (818) 702-0202 Woodland Hills   (702) 366-0500 Henderson      (516) 277-9494 Garden City
(212) 808-8500 New York City   (347) 821-4611 Brooklyn         (518) 490-1910 Albany         (914) 510-9110 White Plains
(312) 379-5566 Chicago         00+1+800 222 1231 Paris         00+1+800 222 1231 Dubai       001+1+800 222 1231 Hong Kong

```
 1                    UNITED STATES DISTRICT COURT

 2         CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3

 4    MOSAIC BRANDS, INC.,            )  No. 2:20-cv-04556-AB-JC
                                      )
 5              PLAINTIFF,            )
                                      )
 6         VS.                        )
                                      )
 7    THE RIDGE WALLET LLC,           )
                                      )
 8              DEFENDANT.            )
      _____)
 9                                    )
      AND RELATED COUNTERCLAIM.       )
10    _____)

11

12

13            THIS TRANSCRIPT CONTAINS PORTIONS MARKED

14                CONFIDENTIAL, ATTORNEYS' EYES ONLY,

15               PURSUANT TO STIPULATION BY ATTORNEYS

16                    WHICH ARE BOUND SEPARATELY

17

18         VIDEOTAPED DEPOSITION OF MIA KAMINSKI, VOLUME I,

19    under Federal Rules of Civil Procedure Rule 30(b)(6),

20    taken via remote videoconferencing on behalf of the

21    Defendant and Counterclaimant in Pittsburg, California,

22    commencing at 9:06 a.m., February 5, 2021, before ANGELA

23    POURTABIB, Certified Shorthand Reporter 13714.

24

25
```

```
09:51  1   then, it wasn't an issue.  As much of an issue, rather.
09:51  2         Q.  Yeah, but can you give me a date on that?  Is it
09:51  3   2019?  Is it --
09:51  4         A.  Probably 2016, '17, it started to become, but,
09:51  5   you know, it was not huge.  I'd say '18, '19, it's more of
09:51  6   an issue.  And people were scared.  I think people get,
09:51  7   you know, fear instilled in them, and then it helps sell
09:51  8   things.
09:51  9         Q.  Do you have any invoices received for payment for
09:51 10   any products from 2012 to 2018?
09:52 11         A.  If we gave it to you, we -- it would be in the
09:52 12   discovery we gave you.
09:52 13         Q.  Okay.  And by "products," I mean the Storus Smart
09:52 14   Money Clip II.
09:52 15         A.  It would be in the discovery that we provided.
09:52 16         Q.  Okay.  When you were at these trade shows, were
09:52 17   there products that had copied you there?
09:52 18         A.  Oh, people try to copy all of our products.
09:52 19   We're fighting this constantly.  So, yes, they're always
09:52 20   coming by our booth and trying to take photos and copy us,
09:52 21   so who knows?
09:52 22         Q.  Okay.  And --
09:52 23         A.  Factories come by too.  That's what we suspect
09:52 24   how this one got to a hundred factories.
09:52 25         Q.  That's a question.  So you -- you've -- your
```

43

```
09:58  1   correspondence, but I -- hundreds of factories are making
09:58  2   our product now.  Hundreds.
09:58  3           Q.  I believe you.  In 2012, were hundreds making
09:58  4   this product?
09:58  5           A.  I have no idea in 2012.  Probably.
09:58  6           Q.  Okay.  So were you seeing lots of knockoff
09:58  7   products in the marketplace in 2012?
09:58  8           A.  I -- we weren't really looking until customers
09:58  9   and friends brought it to our attention that The Ridge was
09:58 10   knocking off our exact product.
09:58 11           Q.  When was that?
09:58 12           A.  I think it was 2019 when I first heard of it from
09:58 13   friends, and I started looking on Amazon and seeing all
09:58 14   these people making an exact product.  And, you know,
09:58 15   that's when we called -- tried to find an attorney and
09:58 16   found one and got a lawsuit filed.
09:58 17           Q.  So you weren't really looking between 2012 and
09:59 18   2019?
09:59 19           A.  I had my hands full --
09:59 20               (Reporter clarification.)
09:59 21               MR. RICHARDSON:  Yeah.  Sorry.  Objection.
09:59 22   Misstates witness testimony.
09:59 23               MR. PEARCE:  Q.  So you weren't really looking
09:59 24   between 2012 and 2019?
09:59 25           A.  I wouldn't say I wasn't really looking, but I --
```

48

```
10:15  1        A.   Scott Kaminski would have seen it.
10:15  2        Q.   Right.
10:15  3        A.   I would have seen it.
10:15  4        Q.   Did anyone other than you two see it?
10:15  5        A.   The factory.  I don't know who saw it at the
10:15  6   factory.
10:15  7        Q.   Right.  But I'm thinking internally to Storus or
10:15  8   Mosaic Brands.
10:15  9        A.   Product development is me and Scott.
10:15 10        Q.   Okay.  So there's no correspondence.  There's no
10:15 11   contemporaneous third party who saw it.  Would anybody
10:15 12   else have seen it?  Or would it have appeared anywhere
10:15 13   else at the time, Mia?
10:15 14        A.   Not that I recall, but the factory owner would be
10:16 15   able to testify to that.
10:16 16        Q.   Okay.  Have you been in communication with them?
10:16 17        A.   We're actually trying to find him right now.  We
10:16 18   think we know where he is.  So we're going to try to get
10:16 19   him to come to the trial in August.
10:16 20        Q.   Okay.  Have you identified him on that second
10:16 21   supplemental response we were going through earlier today?
10:16 22        A.   Did we do that?
10:16 23        Q.   What is his name?
10:16 24        A.   Mr. Liu.
10:16 25        Q.   Let me -- I will find it for you.
```

60

MIA KAMINSKI, VOLUME I

BARKLEY
Court Reporters

```
10:16  1        A.   Yeah, I thought we did.
10:16  2        Q.   Referring back to 1002.  Exhibit 1002.  Does his
10:17  3   name appear on this list of people, Mia?
10:17  4        A.   I think we found that -- I don't know.  It's on
10:17  5   that invoice, though.  I believe.
10:17  6        Q.   Marking this Exhibit 1006.  '7.  I apologize, '7.
10:17  7             (Defendant's Exhibit 1007 was marked for
10:17  8             identification.)
10:17  9             MR. PEARCE:  Q.  Does his name appear on here?
10:17 10        A.   Let me look.  Yeah.  The e-mail, Liu.
10:17 11        Q.   Mm-hmm.
10:17 12        A.   Mr. Liu.
10:17 13        Q.   163.  Okay.  So you've been in communication with
10:17 14   him?
10:17 15        A.   No, we have -- you know, we've asked people to
10:17 16   look for him because his -- I think his factory shut down.
10:17 17        Q.   Mm-hmm.
10:17 18        A.   So...
10:17 19        Q.   Since we're here, 960 pieces.  Does that sound
10:17 20   right?  What we talked about earlier.
10:17 21        A.   Well, if it's on the invoice, that's what we got.
10:17 22        Q.   The date is October 9th, 2010.  It's a little
10:17 23   fuzzy.  Does that sound right?
10:17 24        A.   I can't read it.
10:17 25        Q.   Yeah.  It's tough to read.
```

10:19 1        MR. PEARCE:  Q.  Does this design have any
10:19 2   elastic straps on it?
10:19 3        A.  It does, yeah.
10:19 4        Q.  It does.  Where are they?
10:19 5        A.  Well, this one doesn't show them because it's
10:19 6   just a mold.  It's not a final product.
10:19 7        Q.  Okay.  Where would they appear?  Would it be here
10:19 8   on the sides?
10:19 9        A.  Yeah, in those little slots.  Just like on the
10:19 10  other one with the slots.
10:19 11       Q.  Okay.  Well, does it only go one way?  It
10:19 12  wouldn't go both ways?
10:19 13       A.  I think that one -- I don't know.  Let me see.
10:19 14  Can you turn it around to the other side?  I forget what
10:19 15  the other side looks like.
10:19 16            Yeah, I think it's just one way on that one.
10:19 17       Q.  Yeah.  Okay.
10:19 18       A.  I don't know.  I'd have to see the mold.  I have
10:19 19  to pull it out.
10:19 20       Q.  Okay.  So how have you been communicating with
10:20 21  Mr. Liu or people who are trying to reach him?
10:20 22       A.  I WhatsApp someone that I think might know where
10:20 23  he is, and they're trying to get him to come talk to us.
10:20 24  They know this is a big issue.
10:20 25       Q.  Do you use an iPhone, Mia?

63

```
10:20  1         A.   No.  I usually talk to anyone in a foreign
10:20  2   country by WhatsApp.
10:20  3         Q.   Understood.  Are you using an iPhone to
10:20  4   communicate via WhatsApp?
10:20  5         A.   No.  I usually use it on my computer.
10:20  6         Q.   Okay.  Are you familiar with screen capture
10:20  7   software available for computers?
10:20  8         A.   It's so weird.  It's not working on my computer.
10:20  9   I tried to do it the other day to give something to
10:20 10   someone, and it doesn't hold the screen.  It's bizarre.
10:20 11   So I can't get it to work.  Do you recommend one?
10:20 12         Q.   I have several that I've used.  I think your
10:20 13   attorney probably could recommend one as well.
10:20 14         A.   Okay.
10:20 15         Q.   All right.  So that date is October 2010.  Let's
10:21 16   look at the rest of this exhibit.  Do you see the date on
10:21 17   this one?  It's very fuzzy.
10:21 18         A.   Yeah, it's old.
10:21 19         Q.   Is this the same design as the one in the first
10:21 20   page or a different design?
10:21 21         A.   I think those are different designs, aren't they?
10:21 22   Let me see.
10:21 23         Q.   That's probably the best picture.
10:21 24         A.   There's a whole bunch of different designs done.
10:21 25   We don't just do one.
```

```
10:31   1          Q.   Mm-hmm.
10:31   2          A.   So it's difficult to accumulate and to track.  We
10:31   3     don't have a report that we use.
10:31   4          Q.   Did you track advertising spend from 2011, the
10:31   5     introduction of the product, until 2020 in any way?
10:31   6          A.   Well, we went to trade shows, and, you know,
10:31   7     those costs are marketing and advertising.  So those are
10:31   8     hard costs, but, you know, it covers all of our products
10:31   9     when we go.  We don't just take one item.  We're not a one
10:31  10     item company.
10:31  11          Q.   Right.  But do you track that?  Do you have
10:31  12     records of that spend, or where it was spent, or anything
10:31  13     like that?
10:31  14          A.   We didn't really track it.  In our heads, I
10:31  15     guess.
10:31  16          Q.   Okay.  Let's mark this Exhibit --
10:32  17               MR. TAMSUT:  1010.
10:32  18               MR. PEARCE:  1010.
10:32  19               (Defendant's Exhibit 1010 was marked for
10:32  20               identification.)
10:32  21               MR. PEARCE:  Q.  Do you recognize this, Mia?
10:32  22          A.   I can't even see it.
10:32  23          Q.   I know.  It's small to me as well.  I'll try to
10:32  24     make it bigger for you.  Let me tell you what I think it
10:32  25     is, and you tell me if I'm right.  I think this is the
```

```
10:47  1   really actively monitor the market.  Is that -- for one
10:47  2   product.  Is that fair, or is that not fair?
10:47  3              MR. RICHARDSON:  Objection.  Misstates witness
10:47  4   testimony.
10:47  5              THE WITNESS:  We have a lot of products.  We
10:47  6   don't have too many.  But when you're a one product
10:48  7   company like The Ridge was, just like when I was a one
10:48  8   product company with just the Tonytail, it's really easy
10:48  9   to look out for just one product, and to market it, and to
10:48 10   get it out there, and show the world.  It's really simple.
10:48 11              But once you grow your company to, you know, 800
10:48 12   to a thousand SKUs, and you all of a sudden get, you know,
10:48 13   hurt by a pandemic, and you have hardly anybody helping
10:48 14   you, and you have two children to boot, at home schooling
10:48 15   because the teachers are on strike from COVID, it makes it
10:48 16   really difficult for any person to monitor all those
10:48 17   products with no help.
10:48 18              MR. PEARCE:  Q.  When did you become aware that
10:48 19   someone was knocking off your product?
10:48 20         A.   Are you referring to the Smart Wallet or the
10:48 21   Smart Money Clip II?
10:48 22         Q.   Smart Money Clip II.
10:48 23         A.   We -- some friends told me -- I forget who -- in
10:49 24   passing that -- "Did you see that company that's knocked
10:49 25   off your product?  I thought it was yours, and it's not."
```

```
10:49  1              And that inspired me to go look and search on
10:49  2   Amazon.  And then the factories in China to see who is
10:49  3   making them, and there's just hundreds of factories making
10:49  4   it.
10:49  5          Q.  Right.  But when did you become aware that
10:49  6   someone -- anyone was knocking off your product?
10:49  7          A.  When my friends -- a couple people and then there
10:49  8   was an e-mail from a customer told us.  It must have been
10:49  9   -- I think you asked me this in my last deposition a few
10:49 10   times.  I thought it was August or October.  September,
10:49 11   October, November of 2019.
10:49 12          Q.  Okay.  So before that, you were unaware of any of
10:49 13   this?
10:49 14          A.  Unfortunately, I was.
10:49 15          Q.  Oh, I do have a question, Mia.  So I
10:50 16   understand -- well, I understand you filed a copyright
10:50 17   application to register your design -- and we talked about
10:50 18   it in our last deposition -- listing 2019 as the
10:51 19   publication date.  I was wondering what the status of that
10:51 20   application is.  Has it been approved?  Has it been
10:51 21   refused?
10:51 22          A.  I don't know.
10:51 23          Q.  Okay.
10:51 24              MR. RICHARDSON:  We've been going for almost two
10:51 25   hours.  Do you want to take a quick break?
```

84

```
 1        Before completion of the deposition, review of
 2   the transcript [XX] was [  ] was not requested.  If
 3   requested, any changes made by the deponent (and provided
 4   to the reporter) during the period allowed, are appended
 5   hereto. (Fed. R. Civ. P. 30(e)).
 6
 7
 8   Dated:  February 19, 2021
 9
10
11                    [signature: Angela Pourtabib]
12             _____
                   Angela Pourtabib, CSR 13714, RPR
13
```